Original
No. 2004-361

## PETITION OF SENATOR CLIFTON BELOW & a.

Argued: June 10, 2004
Opinion Issued: June 22, 2004

*Paul Twomey,* of Epsom, by memorandum and orally, for the petitioners.

*Peter W. Heed,* attorney general (*Wynn E. Arnold,* senior assistant attorney general, on the memorandum and orally), for the State.

*Soltani/Mosca, P.L.L.C.,* of Epsom (*Edward C. Mosca* on the memorandum), for the intervenors, Representative Tony F. Soltani *& a.*

*Betsy B. Miller,* house legal counsel, and *Richard J. Lehmann,* senate legal counsel, by memorandum and orally, for the New Hampshire House of Representatives and the New Hampshire Senate, as *amici curiae.*

PER CURIAM. To safeguard the equal voting rights of the New Hampshire electorate, this court, in 2002, was called upon to establish new district plans for the house and senate. *See Below v. Secretary of State,* 148 N.H. 1 (2002); *Burling v. Speaker of the House,* 148 N.H. 143 (2002). This task fell to the court because, despite its constitutional mandate to do so, the New Hampshire legislature was unsuccessful in its efforts to reapportion the house and senate during the session following the 2000 census. *Below,* 148 N.H. at 3; *Burling,* 148 N.H. at 145-46.

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555 (1964). This right can neither be denied outright nor diluted by weighting one citizen's right more than another's. *Id.* The Equal Protection Clauses of the New Hampshire and Federal Constitutions "demand[] no less than substantially equal state legislative representation for all citizens, of all places as well as of all races." *Id.* at 568. Thus, "the overriding objective [of legislative apportionment] must be substantial equality of population among the various [legislative] districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Id.* at 579.

The parties in *Below* and *Burling* agreed that, absent a new district plan, the existing districts, formed in 1992, violated the constitutional imperative of one person/one vote. *Below,* 148 N.H. at 3; *Burling,* 148 N.H. at 145. Consequently, our oath and our office required us to reapportion the house and senate to protect the people's constitutional right to one person/one vote. *Burling,* 148 N.H. at 144; *Reynolds,* 377 U.S. at 566. The petitioners, Senator Clifton Below and Representative Peter Burling, and the respondent, the New Hampshire Secretary of State, concur that the court had the obligation and authority to engage in redistricting under the circumstances presented in 2002. *See Scott v. Germano,* 381 U.S. 407, 409 (1965) (per curiam).

We did so reluctantly because we understood that redistricting is an inherently political process. *See Jensen v. Wisconsin Elections Bd.,* 639 N.W.2d 537, 540 (Wis. 2002). Unlike the legislature, courts have "no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name." *Below,* 148 N.H. at 5

(quotation omitted). "Had the legislature complied with its obligation to reapportion according to constitutional requisites in a timely fashion, our intervention would have been unnecessary." *Id.* (quotation and ellipsis omitted).

In 2004, two years after the court's redistricting plan became effective but before the next statewide election, the legislature passed two bills amending it: House Bill (HB) 1292 and HB 264. HB 1292 partially redistricts the New Hampshire House of Representatives; HB 264 partially redistricts the New Hampshire Senate. In this case, we have been asked whether the legislature had the authority to amend the court's redistricting plan. We conclude that it did.

■ ■ The New Hampshire Constitution directs the legislature to reapportion the house and the senate at its regular session following the federal decennial census. *See* N.H. CONST. pt. II, arts. 9, 11 and 26. When the legislature fails to enact a new redistricting plan at that session, it is neither deprived of its authority nor relieved of its obligation to redistrict. "The Constitution does not contemplate that the Legislature, by failing to act when it should, can impose on the people for ten years an apportionment which changes in population have made unequal and hence constitutionally inappropriate." *Lamson v. Secretary of Commonwealth*, 168 N.E.2d 480, 484 (Mass. 1960). Once the legislature has enacted a valid apportionment law, "no future act may be passed by [it] until after the next regular apportionment period prescribed by the Constitution." *Certification of a Question of Law*, 615 N.W.2d 590, 595 (S.D. 2000) (quotation omitted).

Although, in 2002, the court was "left with the unwelcome obligation of performing in the legislature's stead," the court's redistricting plan did not deprive the legislature of its authority to enact a redistricting plan. *Connor v. Finch*, 431 U.S. 407, 415 (1977); *see People Ex Rel. Salazar v. Davidson*, 79 P.3d 1221, 1248 (Colo. 2003) (Kourlis, J., dissenting), *cert. denied*, 72 U.S.L.W. 3739 (U.S. June 7, 2004) (No. 03-1082). Accordingly, we hold that the legislature had the constitutional authority to enact HB 1292 and HB 264, and that in doing so it fulfilled its constitutional obligation to enact a redistricting plan based upon the 2000 census. *See Monier v. Gallen*, 122 N.H. 474, 476 (1982).

The petitioners assert that the new districts created by HB 1292 and HB 264 violate the Federal and State Constitutions and the Federal Voting Rights Act. *See* U.S. CONST. amend. XIV; N.H. CONST. pt. II, arts. 9 and 26; 42 U.S.C. § 1973c (2003). We express no opinion as to whether the legislature's reapportionment plan complies with one person/one vote

or other constitutional or statutory requisites. We leave any resolution of these issues for a trial court in the first instance.

*I. Background and Procedural History*

Before we decided *Below* and *Burling* in 2002, the house and senate were last reapportioned in 1992, following the 1990 federal decennial census. *Below*, 148 N.H. at 3; *Burling*, 148 N.H. at 145. The parties in this case, like the parties in *Below* and *Burling*, agree that, as of 2002, the legislative districts drawn in 1992 violated both the State and Federal Constitutions. *Below*, 148 N.H. at 3; *Burling*, 148 N.H. at 145.

In the winter of 2002, the Republican leadership of the house and senate introduced legislation to create new legislative districts based upon the 2000 census. *Below*, 148 N.H. at 4; *Burling*, 148 N.H. at 145. Although this legislation passed both houses, the Governor vetoed it, and the legislature was unable to override the veto. *Below*, 148 N.H. at 4; *Burling*, 148 N.H. at 145. As a result, the legislature recessed on May 22, 2002, without enacting a new house or senate reapportionment plan. *Below*, 148 N.H. at 4; *Burling*, 148 N.H. at 145-46.

In April 2002, the court was petitioned to declare the existing legislative districts unconstitutional. *Below*, 148 N.H. at 4; *Burling*, 148 N.H. at 145. Following the legislature's recess, and the parties' agreement that the existing districts were unconstitutional, the court had no choice but to redraw the districts itself. *See Below*, 148 N.H. at 4; *Burling*, 148 N.H. at 146. The 2002 elections went forward based upon the court's reapportionment plan.

The legislature sought to amend the court's plan at its next regular session following the *Below* and *Burling* decisions. In January 2003, it began considering HB 264. The parties agree that this bill changes nine of the twenty-four senate districts the court formed in *Below*. HB 1292 was introduced in September 2003. The parties agree that this bill changes twenty-one of the eighty-eight house districts the court created in *Burling*. The petitioners allege that these bills affect an additional thirty-two house districts.

The court's jurisdiction in this matter was invoked on May 27, 2004, when the petitioners, members of the minority leadership in the house and senate, filed a petition for original jurisdiction. The petition alleged that HB 1292 and HB 264, which at that point were not yet effective, would create an unconstitutional legislative apportionment scheme in New Hampshire. Given the imminence of the June 2, 2004 statutory filing period for house and senate candidates, the court endeavored to act quickly. *See* RSA 655:14 (1996). On May 28, 2004, it accepted the first question in the petition, which asked whether the legislature was barred

from enacting HB 1292 and HB 264 by Part II, Articles 9 and 26 of the New Hampshire Constitution. The court deferred deciding whether to accept the other questions in the petition. Oral argument was scheduled and held on June 10, 2004.

On May 28, the court also stayed the statutory filing period for all house and senate candidates, and on June 1, lifted the stay of the filing period for candidates in the senate districts that HB 1292 and HB 264 did not affect. On June 4, the court lifted the stay of the filing period for candidates in the house districts that none of the parties asserted were affected by HB 1292 and HB 264.

## II. Relevant State Constitutional Provisions

To determine whether the legislature had the constitutional authority to enact HB 1292 and HB 264, we must first examine the language of the relevant constitutional provisions. *See* N.H. CONST. pt. II, arts. 9, 11 and 26. "It is the role of this court in our co-equal, tripartite form of government to interpret the Constitution and to resolve disputes arising under it." *Monier*, 122 N.H. at 476. We are the final arbiter of State constitutional disputes. *Smith v. State*, 118 N.H. 764, 768 (1978).

When interpreting a constitutional provision, "we will look to its purpose and intent, bearing in mind that we will give the words in question the meaning they must be presumed to have had to the electorate when the vote was cast." *Opinion of the Justices*, 126 N.H. 490, 495 (1985). Reviewing the history of the constitution and its amendments is often instructive, and in so doing, it is the court's "duty . . . to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in the light of the surrounding circumstances." *Warburton v. Thomas*, 136 N.H. 383, 387 (1992) (quotation omitted). "The language used . . . by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the time when the constitution and the laws were adopted." *N.H. Motor Transport Assoc. v. State*, 150 N.H. 762, 765 (2004) (quotation and brackets omitted).

Three provisions of the New Hampshire Constitution govern the legislature's power to apportion: Part II, Articles 9, 11 and 26. Part II, Articles 9 and 11 concern legislative authority to apportion the house; Part II, Article 26 concerns its authority to apportion the senate. All three provisions were last amended in 1964. *See Below*, 148 N.H. at 5-6; *Burling*, 148 N.H. at 147.

Part II, Article 9 provides:

> There shall be in the legislature of this state a house of representatives, biennially elected and founded on principles of equality, and representation therein shall be as equal as circumstances will admit. The whole number of representatives to be chosen from the towns, wards, places, and representative districts thereof established hereunder, shall be not less than three hundred seventy-five or more than four hundred. *As soon as possible after the convening of the next regular session of the legislature, and at the session in 1971, and every ten years thereafter, the legislature shall make an apportionment of representatives according to the last general census of the inhabitants of the state taken by authority of the United States or of this state.* In making such apportionment, no town, ward or place shall be divided nor the boundaries thereof altered.

N.H. CONST. pt. II, art. 9 (emphasis added).

Part II, Article 11, entitled "Small Towns; Representation by Districts," provides in pertinent part:

> When any town, ward, or unincorporated place, according to the last federal decennial census, has less than the number of inhabitants necessary to entitle it to one representative, the legislature shall form those towns, wards, or unincorporated places into representative districts which contain a sufficient number of inhabitants to entitle each district so formed to one or more representatives for the entire district. . . . *The legislature shall form the representative districts at its next session after approval of this article by the voters of the state, and thereafter at the regular session following every decennial federal census.*

N.H. CONST. pt. II, art. 11 (emphasis added).

Part II, Article 26 provides:

> And that the state may be equally represented in the senate, the legislature shall divide the state into single-member districts, as nearly equal as may be in population, each consisting of contiguous towns, city wards and unincorporated places, without dividing any town, city ward or unincorporated place. *The legislature shall form the single-member districts at its next session after approval of this article by the voters of the state and thereafter at the regular session following each decennial federal census.*

N.H. CONST. pt. II, art. 26 (emphasis added).

To understand the meaning of these provisions, we examine their history, as well as their purpose and intent. *See N.H. Motor Transport Assoc.*, 150 N.H. at 765.

### A. History of Part II, Articles 9 & 11

When Part II, Articles 9 and 11 were first enacted in 1784, "rateable polls" were the basis for representation; 150 rateable polls were required for the first representative and 300 were required for each additional representative. *Levitt v. Attorney General*, 104 N.H. 100, 106 (1962); *see also* JOURNAL OF CONSTITUTIONAL CONVENTION 65 (1941) (1941 JOURNAL). Part II, Article 10 addressed locations with fewer than 150 rateable polls. *Levitt*, 104 N.H. at 106. Under Part II, Article 11, a place that could not be conveniently classed in a voting district could obtain authority to elect a representative. *Id.*

"By 1876 increases in the size of the House from 91 to 393 members, coupled with abuses in the determination of the numbers of 'rateable polls,' made a change in these provisions imperative." *Id.* (citation omitted). The 1876 constitutional convention thus substituted inhabitants for polls and made population the basis for apportioning the house. *Id.*; *see also* JOURNAL OF CONSTITUTIONAL CONVENTION 230-31 (1876) (1876 JOURNAL). Pursuant to the amendments from that convention, 600 inhabitants were required for the first representative and 1,200 were required for each additional representative. 1876 JOURNAL at 263; *see also Opinion of the Justices*, 101 N.H. 523, 524 (1957). The number of town or city ward inhabitants would be determined according to the "last general census of the state, taken by authority of the United States or of this state." 1876 JOURNAL at 263. Part II, Article 11 "was also amended to provide for the first time for representation, for a proportionate part of the time only, of places of less than six hundred inhabitants." *Levitt*, 104 N.H. at 106. The 1876 amendments did not specify when the legislature was to apportion the house; however, it was legislative practice "to make a periodic reapportionment every ten years, following each Federal census." *Opinion of the Justices*, 106 N.H. 233, 235 (1965).

Part II, Article 10 was repealed in 1889. *Levitt*, 104 N.H. at 107. Part II, Article 11 was amended to incorporate its provisions. *See* JOURNAL OF CONSTITUTIONAL CONVENTION 248-49 (1889).

Part II, Articles 9 and 11 were next amended following the 1941 constitutional convention. Because the house had grown substantially to an expected 443 members according to the 1940 census, the 1941 constitutional convention was charged with making the house smaller. *See* 1941 JOURNAL at 64-65. Several resolutions were introduced to achieve

this. *See id.* at 14-15, 18-19, 20-21, 26-27, 34-35. Ultimately, the convention voted on three resolutions. *See id.* at 59-63. All three resolutions required the legislature to reapportion every ten years according to the last general census, as had been the legislature's practice since 1876. *See id.* at 59, 61, 62; *see also Opinion of the Justices,* 106 N.H. at 235. The resolutions differed with respect to the size of the house and the number of inhabitants that entitled a town or ward to its first representative. *See* 1941 JOURNAL at 59-63.

As amended by the 1941 convention, Part II, Article 9 provided:

> There shall be in the legislature of this state a house of representatives, biennially elected and founded on principles of equality, and representation therein shall be as equal as circumstances will admit. The whole number of representatives to be chosen from the towns and wards shall be not less than three hundred seventy-five or more than four hundred. At the next session of the legislature, and at the session in 1951, and every ten years thereafter, the legislature shall make an apportionment of representatives according to the last general census of the inhabitants of the state taken by the authority of the United States or of this state. The number of inhabitants necessary to entitle any town or ward to representatives additional to the first shall be for each additional representative twice the number of inhabitants required for the first representative, so that the mean increasing number for every additional representative shall be twice the number required for the first or one representative. In making such apportionment no town shall be divided, or the boundaries of the wards of any city so altered, as to increase the number of representatives to which such town or city may be entitled by the last preceding census.

N.H. CONST. pt. II, art. 9 (amended 1964), *reprinted in* 1 N.H. REV. STAT. ANN. 97 (1955).

Also as amended by the 1941 convention, Part II, Article 11 provided:

> Whenever any town or ward shall have less than the number of inhabitants necessary to entitle such town or ward to one representative the legislature shall authorize such town or ward to elect and send a representative such proportionate part of the time as the number of its inhabitants shall bear to the requisite number established for one representative and without such authority no town or ward shall send a representative; *provided,*

*however*, that each town and ward shall be entitled to representation in at least one session in every ten years.

N.H. CONST. pt. II, art. 11 (amended 1964), *reprinted in* 1 N.H. REV. STAT. ANN. 98 (1955).

These provisions were amended again in 1964. The 1964 constitutional convention was informed that Part II, Article 9 was likely unconstitutional because it required towns and wards to have twice as many people for each additional representative as they needed for the first representative. *Burling*, 148 N.H. at 148. They were also informed that Part II, Article 11 was likely unconstitutional because it provided only part-time representation to citizens of small towns and wards. *Id.* Thus, they endeavored to amend both articles to make them constitutional.

Before adjourning on June 10, 1964, the convention successfully amended Part II, Article 11 to allow citizens of small towns and wards full-time representation. *Id.* As amended, Part II, Article 11 permitted the legislature to create legislative districts by joining towns, wards and unincorporated places that were too small to be entitled to one full-time representative. *Id.* It required the legislature to form these districts "at its next session after approval of this article by the voters of the state, and thereafter at the regular session following every decennial federal census." N.H. CONST. pt. II, art. 11.

Although the convention delegates debated, at length, whether to retain the requirement that a town or ward have twice as many citizens for each additional representative as it needed for the first, they were unable to resolve this issue before adjourning. *See* JOURNAL OF CONSTITUTIONAL CONVENTION 221-50 (1964) (1964 JOURNAL). Some delegates believed that it was appropriate to retain the current apportionment method for the house because it represented "an intricate balance ... between representation of town and of population." *Id.* at 243. Others recognized that requiring towns and wards to have twice as much population for each additional representative violated the principle of one person/one vote:

> Now the Constitutional issue, the Constitutional problem which is posed by our present representation system, is made clear by a series of decisions that have come forth with the following maxim: equal numbers must have equal representation. There isn't any way that we can get around it. This is the maxim that has been proposed by the Supreme Court, and it is put in language that is just that simple.... We must follow the proposition that equal representation is given to equal numbers.

*Id.* at 233-34.

The delegates were aware, however, of a federal court decision issued approximately one week after the convention began, that intimated that only one house in a bicameral legislature needed to be apportioned on a population basis. *Burling*, 148 N.H. at 148; *see Levitt v. Stark*, 233 F. Supp. 566, 569 (D.N.H. 1964). Thus, once they successfully amended Part II, Article 26 to apportion the senate based upon population, they believed it unnecessary to amend Part II, Article 9 and adjourned without doing so. *See Below*, 148 N.H. at 7.

Five days after the convention adjourned, the United States Supreme Court decided *Reynolds. See Opinion of the Justices*, 106 N.H. at 235. In *Reynolds*, the United States Supreme Court made clear, for the first time, that the Federal Constitution required *both* houses of a bicameral state legislature to be apportioned on the basis of population. *Reynolds*, 377 U.S. at 576. The convention reconvened on July 8, 1964, approximately three weeks after *Reynolds* was decided, and amended Part II, Article 9 to eliminate the requirement that towns and wards have twice as much population for each additional representative as they needed for the first. *See* 1964 JOURNAL at 358.

In *Reynolds*, the Court also "held that a decennial reapportionment would clearly meet the requirements for maintaining a reasonably current scheme of legislative representation." *Opinion of the Justices*, 106 N.H. at 235; *see Reynolds*, 377 U.S. at 583-84. Accordingly, when the convention reconvened, it retained the requirement in Part II, Article 9 that the legislature reapportion the house every ten years, following the federal census. *See* 1964 JOURNAL at 358.

The convention's amendments to the language governing when the legislature must reapportion were technical, not substantive. For instance, while the 1941 amendments to Part II, Article 9 required the legislature to apportion "[a]t [its] next session," 1941 JOURNAL at 95, the 1964 amendments required it to apportion "[a]s soon as possible after the convening of [its] next regular session," 1964 JOURNAL at 358. While the 1941 amendments required the legislature to reapportion "at the session in 1951, and every ten years thereafter," 1941 JOURNAL at 95, the 1964 amendments required the legislature to reapportion "at the session in 1971, and every ten years thereafter," 1964 JOURNAL at 358.

### B. History of Part II, Article 26

Before Part II, Article 26 was amended in 1964, senate districts were apportioned on the basis of taxes, not population. *Below*, 148 N.H. at 6. Before 1964, Part II, Article 26 read:

> And that the state may be equally represented in the senate, the legislature shall, from time to time divide the state into twenty-four districts, as nearly equal as may be without dividing towns and unincorporated places; and in making this division, they shall govern themselves by the proportion of direct taxes paid by the said districts, and timely make known to the inhabitants of the state the limits of each district.

*Id.* (quotation omitted). Although this provision required the legislature to redistrict the senate "from time to time," the legislature failed to redistrict the senate at all between 1915 and 1961. *Id.*

When the 1964 constitutional convention convened, the delegates understood that it was "only a matter of time" before the New Hampshire system of apportioning the senate according to taxable property was declared unconstitutional. *Id.* (quotation omitted). Accordingly, when the delegates were unable to agree upon changes to Part II, Article 9, they turned their attention to Part II, Article 26. *Id.* at 7. "The convention thus resolved to amend Part II, Article 26 to make clear that senate districts would be apportioned based upon population equality and would be redrawn every ten years, following the decennial census." *Id.* As amended, Part II, Article 26 required the legislature to reapportion "at its next session after approval of this article by the voters of the state and thereafter at the regular session following each decennial federal census." N.H. CONST. pt. II, art. 26. This language is similar to the language added to Part II, Article 11 by the same constitutional convention. *See* N.H. CONST. pt. II, art. 11.

The delegates did not debate how frequently the legislature should reapportion the senate. Rather, their debates centered upon whether the size of the senate should remain at twenty-four or be increased to thirty or thirty-six members. 1964 JOURNAL at 266-76.

*C. Interpretation of Part II, Articles 9, 11 & 26*

From the history described above we reach the following conclusions. The policy and practice in New Hampshire has been to create legislative districts once every ten years based upon the federal census. This policy and practice began in 1876, when, for the first time, population became the basis of apportioning the house. *See Opinion of the Justices*, 106 N.H. at 235. Decennial reapportionment became a constitutional mandate in 1942, when Part II, Article 9 was amended to state: "At the next session of the legislature, and at the session in 1951, and every ten years thereafter, the legislature shall make an apportionment of representatives according to the last general census of the inhabitants of the state taken by the

authority of the United States or of this state." N.H. CONST. pt. II, art. 9 (amended 1964), *reprinted in* 1 N.H. REV. STAT. ANN. 97 (1955).

■ This language makes clear the intent that the legislature reapportion *once* in a ten-year period: in 1943 (following the 1942 amendments), again in 1951 (following the 1950 census), and every ten years after the last decennial federal census (*e.g.*, in 1961, 1971, 1981, 1991, 2001, etc.). As soon as the legislature has fulfilled its constitutional duty to reapportion once based upon the last federal census, it may not reapportion again until the *next* federal census. *See Opinion of the Justices*, 105 N.H. 125, 128 (1963); *see also Certification of a Question of Law*, 615 N.W.2d at 595.

As we explained in *Opinion of the Justices*:

> Article 9th provides that apportionment shall be made "every ten years" commencing in 1951, and "according to the last general census."
>
> . . . .
>
> . It seems clear to us that the constitutional mandate establishes only one yardstick as a legislative guide in making an apportionment, and that is "the last general census of the inhabitants of the state taken by authority of the United States or of this state." There being no provision for a state census, the Federal census must be used. Since the Constitution provides for no reapportionment during the ten-year period following 1961, it is not "constitutionally competent" for the General Court to authorize an election of a representative by [a town that came into existence after the 1960 census] in the year 1966.

*Opinion of the Justices*, 105 N.H. at 128 (citation omitted). The 1964 amendments to Part II, Article 9 did not change this fundamental requirement.

Once population became the basis for providing representation to residents of small towns and wards in the house and for apportioning the senate, it became necessary for Part II, Articles 11 and 26, like Part II, Article 9, to require decennial reapportionment. Thus, in 1964, these articles were amended to require the legislature to form house districts from small towns and wards and single-member senate districts at its next session after approval by the voters of the State and thereafter at the regular session following each decennial federal census. N.H. CONST. pt. II, arts. 11, 26. Although the language used in these articles differs slightly from that in Article 9, the import is the same—the legislature must reapportion once every ten years, following each federal census.

The petitioners agree that Part II, Articles 9, 11 and 26 require apportionment once every ten years. They argue, however, that these provisions permit the legislature to redistrict *only* at the session immediately following the federal census. Having failed to redistrict at its 2002 session, they contend the legislature could not redistrict at its 2004 session. Alternatively, they assert that the legislature could not redistrict in 2004 because the court acted in its stead by redistricting in 2002. We address each contention in turn.

*III. Petitioners' Arguments*

*A. When Legislature Must Apportion*

The petitioners first argue that the legislature was precluded from enacting a reapportionment plan in 2004 because it failed to do so at its regular session following the 2000 census. They observe that Part II, Article 9 requires the legislature to reapportion at "the session," and Part II, Articles 11 and 26 require it to reapportion "at the regular session," following each federal census. They conclude that the plain meaning of this language prohibits the legislature from apportioning at any session other than the one immediately following the federal census.

While we acknowledge that a literal reading of Part II, Articles 9, 11 and 26 supports the petitioners' argument, it ignores the purpose and intent of requiring decennial reapportionment, which is to ensure substantially equal representation based upon population. *See Reynolds*, 377 U.S. at 579. *Reynolds*, for instance, was prompted by the Alabama legislature's failure to reapportion for over *sixty* years. *Id.* at 569-70. The Alabama legislature's "[c]onsistent failure" to comply with the State constitutional requirement of decennial apportionment had created "crazy-quilts completely lacking in rationality." *Id.* at 568, 570. Under the Alabama scheme, some towns with more than 40,000 inhabitants were given one seat in the legislature, while other towns with fewer than 20,000 inhabitants were given two representatives. *Id.* at 568-69 n. 45. Alabama's apportionment scheme was "signally illustrative and symptomatic of the seriousness of this problem in a number of the States." *Id.* at 569.

Thus, in addition to requiring that both houses of a state legislature be apportioned on a population basis, so that "the vote of any citizen is approximately equal in weight to that of any other citizen," the Court ruled that decennial reapportionment "would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation." *Id.* at 579, 583-84. Failure to reapportion at least once every ten years "would assuredly be constitutionally suspect." *Id.* at 584.

Although the language of Part II, Articles 9, 11 and 26 is mandatory (the legislature "shall" reapportion "at the session" or "at the regular session" following the federal census), we do not interpret it to mean that if the legislature is unsuccessful in its efforts to reapportion at the regular session following the decennial census, it is precluded from doing so until the next decennial census. Rather, we believe that the intent of these provisions is "to assure the constitutional right of the people to equal apportionment, and the implication is that the duty and the power to act under [them] continue ... until the power is exercised and discharged." *Lamson*, 168 N.E.2d at 483. Other jurisdictions examining similar constitutional language have reached the same conclusion. *See id.*; *Certification of a Question of Law*, 615 N.W.2d at 595 (citing cases); *Opinion to the Governor*, 185 A.2d 111, 117 (R.I. 1962).

The requirement of decennial reapportionment cannot mean that a State may ignore the results of a federal census and use patently malapportioned districts. *Farnum v. Burns*, 548 F. Supp. 769, 773 (D. R.I. 1982); *see Lamson*, 168 N.E.2d at 484. "The right to an equal vote and to equal representation is too important to permit a state such freedom." *Farnum*, 548 F. Supp. at 773; *see Opinion to the Governor*, 185 A.2d at 117.

By the same token, "[t]he right to an equal vote and to equal representation is [also] too important to allow a state ... absolute discretion in delaying post-census redistricting." *Cardona v. Oakland Unified School Dist., Cal.*, 785 F. Supp. 837, 841 (N.D. Cal. 1992). Decennial reapportionment is intended to be based upon *current* population data. *Id.* "Taken to its extreme, absolute discretion in redistricting, as long as done every ten years, could result in states ... electing to redistrict 9 to 10 years after federal decennial census figures are available." *Id.* at 841 n. 9. Permitting the legislature to redistrict nine years after one federal decennial census, when it must redistrict again in only one or two years following the next census, would impair "the need for stability and continuity in the organization of the legislative system." *Reynolds*, 377 U.S. at 583; *see Salazar*, 79 P.3d at 1242.

Moreover, once the legislature has fulfilled its constitutional obligation to reapportion based upon the decennial census figures, it has no constitutional authority to make another apportionment until after the next federal census. *See Certification of a Question of Law*, 615 N.W.2d at 595. As the South Dakota Supreme Court has explained:

The framers of our Constitution did not, we think, have in mind the possibility that a Legislature might disobey the constitutional mandate, and might fail to make an apportionment at the time

when that duty was affirmatively imposed upon them by the Constitution. It seems quite apparent that the framers of the Constitution in providing for apportionment "at its first regular session, after each enumeration . . . but at no other time," meant to say only this and nothing more: That the Legislature should make an apportionment at the first session after an enumeration as affirmatively required by the Constitution, and having so done (as the Constitution makers assumed they would) they should not again exercise such power until after another enumeration.

. . .

*In other words, when a Legislature once makes an apportionment following an enumeration no Legislature can make another until after the next enumeration.*

*Id.* at 594 (quotation omitted).

In this case, the legislature began considering HB 1292 and HB 264 at its session following the court's decisions in *Below* and *Burling*, before the 2004 election. Had the legislature not enacted its own redistricting plan during this session, however, it might well have been precluded from doing so at a future session. *See Cardona*, 785 F. Supp. at 841.

### B. Court's Role in Redistricting

Relying primarily upon the Colorado Supreme Court's decision in *Salazar*, the petitioners next argue that the court's 2002 reapportionment plan supplanted the legislature's authority to enact redistricting legislation in 2004.

The issue in *Salazar* was whether the Colorado legislature had violated the Colorado Constitution by redrawing boundaries of congressional districts in 2003 after the court had done so in 2002. *Salazar*, 79 P.3d at 1224-26. A majority of the court ruled that the legislature could not redraw congressional districts after the court had done so. *Id.* at 1226. The majority held that when the court redrew congressional districts in 2002, it fulfilled the State's obligation to provide constitutional districts for congressional elections. *Id.* at 1232. The majority reached this conclusion in part by interpreting the term "General Assembly" in the state constitutional provision governing congressional redistricting broadly: "The term 'General Assembly' encompasses the entire legislative process, as well as voter initiatives and redistricting by court order." *Id.* at 1236. In this way, the court interpreted the Colorado Constitution to make the state courts part of the legislative process. *Salazar*, 72 U.S.L.W. at 3739 (Rehnquist, C.J., and Scalia and Thomas, JJ., dissenting from denial of certiorari).

Although the court has a constitutional responsibility to protect the voting rights of the people, we decline to interpret Part II, Articles 9, 11 and 26 to make the court part of the legislative process. As the dissenting justices in *Salazar* rightly observed, "Courts do not enact or create laws; [they] declare what the law is and what it requires." *Salazar*, 79 P.3d at 1243-44 (Kourlis, J. dissenting); *see State v. LaFrance*, 124 N.H. 171, 177 (1983). "To hold otherwise violates . . . the separation of powers among the three coordinate powers of . . . government." *Salazar*, 79 P.3d at 1244 (Kourlis, J., dissenting); *see* N.H. CONST. pt. I, art. 37.

Separation of the three co-equal branches of government is essential to protect against a seizure of control by one branch that would threaten the ability of our citizens to remain a free and sovereign people. *Petition of the Governor and Executive Counsel*, 151 N.H. 1, 9 (2004). Thus, the separation of powers doctrine prohibits each branch from encroaching upon the powers and functions of the other branches. *See Petition of N.H. Bar Assoc.*, 151 N.H. 112, 115-16 (2004).

Our State Constitution vests the authority to redistrict with the legislative branch, and for good reason. "[A] state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality." *Connor*, 431 U.S. at 414-15. Although our intervention was required in *Below* and *Burling*, we tread lightly in this political arena, lest we materially impair the legislature's redistricting power. *See Petition of N.H. Bar Assoc.*, 151 N.H. at 116.

As the Wisconsin Supreme Court has explained:

> [R]edistricting remains an inherently political and legislative—not judicial—task. Courts called upon to perform redistricting are, of course, *judicially legislating*, that is, *writing* the law rather than *interpreting* it, which is not their usual—and usually not their proper—role. Redistricting determines the political landscape for the ensuing decade and thus public policy for years beyond. The framers in their wisdom entrusted this decennial exercise to the legislative branch because the give-and-take of the legislative process, involving as it does representatives elected by the people to make precisely these sorts of political and policy decisions, is preferable to any other.

*Jensen*, 639 N.W.2d at 540. When courts do intervene in this "purely political, legislative process," ordinarily it is to review the constitutionality of existing districts. *Salazar*, 79 P.3d at 1244 (Kourlis, J. dissenting).

■ ■ Judicial relief in the form of newly drawn districts "becomes appropriate only when a legislature fails to reapportion according to ... constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Monier*, 122 N.H. at 476 (quotation omitted); *Reynolds*, 377 U.S. at 586. It is not the court's function to "decide the peculiarly political questions involved in reapportionment, but it is [the court's] duty to insure the electorate equal protection of the laws." *Burling*, 148 N.H. at 144 (quotation omitted). When the legislature has failed to act, it is the judiciary's duty to devise a constitutionally valid reapportionment plan. *See id.* Any such plan preferably is temporary in nature, however. *See Johnson v. Mortham*, 915 F. Supp. 1529, 1544 (N.D. Fla. 1995). Under the separation of powers doctrine, a state court cannot usurp a state legislature's "authority to redistrict or reapportion, subject to constitutional constraints." *Id.*

■ In the *Below* and *Burling* cases, it was undisputed that the existing districts were unconstitutional and that the legislature had failed to reapportion after having had an adequate opportunity to do so. Judicial relief was therefore not only appropriate, but required. *See Monier*, 122 N.H. at 476; *Reynolds*, 377 U.S. at 586. In light of the legislature's unsuccessful efforts to redistrict and the existence of house and senate districts that were constitutionally infirm, the court fashioned a remedy to protect voters in the 2002 elections. *See Salazar*, 79 P.3d at 1248 (Kourlis, J., dissenting). Our plan, however, did not preclude the legislature from enacting HB 1292 and HB 264. *See id.*

*IV. Conclusion*

For all of the above reasons, we conclude that the legislature had the authority to enact HB 1292 and HB 264. With this legislation, the legislature has fulfilled its constitutional obligation to reapportion the house and senate based upon the 2000 census. Pursuant to Part II, Articles 9, 11 and 26, the legislature may not reapportion again until its regular session following the next decennial federal census. In accordance with our ruling, the injunctions we issued against the filing period for house and senate candidates in districts affected by HB 1292 and HB 264 are dissolved. This opinion is effective immediately. Unless otherwise ordered by the court, the filing of any motion to reconsider shall not stay the effective date of this opinion.

*So ordered.*

BRODERICK, C.J., and NADEAU, DALIANIS, DUGGAN and GALWAY, JJ., concurred.